**In re Wade A. CORDES and Tamara J. Cordes, Debtors.**

**Bankruptcy No. 3–92–2592.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Nov. 18, 1992.

Samuel Wertheimer, Roseville, Minn., for debtors.

Stephen J. Creasey, Minneapolis, Minn., for Chapter 13 Trustee.

## ORDER DENYING CONFIRMATION OF PLAN OF DEBT ADJUSTMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 13 case came on before the Court on August 27, 1992, for the hearing on confirmation of the Debtors' modified plan of debt adjustment. The Debtors appeared personally and by their attorney, Samuel Wertheimer. The Chapter 13 Trustee appeared by his attorney, Stephen J. Creasey. Upon the plan, the record made at the hearing, and counsel's pre- and post-hearing briefing, the Court makes the following order.

The Debtors filed a voluntary petition for relief under Chapter 13 on May 1, 1992. The Trustee objected to the confirmation of their original plan of debt adjustment. Their modified plan, as filed on July 6, 1992, is now before the Court, with the Trustee's continuing objection to confirmation.

Under the modified plan, the Debtors propose to pay the sum of $280.00 per month to the Trustee. After payment of priority administrative expenses, the Trustee would be required to pay off two secured claims. The first is held by the Levitz Furniture chain in the amount of approximately $1,100.00. The second is held by State Bank and Trust Company of Man-

kato, Minnesota; it is scheduled by the Debtors in the aggregate amount of $7,690.00, and their counsel estimates it will require a total payment of approximately $8,100.00. After these secured claims are paid in full, the Trustee would be required to satisfy an outstanding claim in favor of Brown County Family Services for child support arrearages, in the sum of $674.00, as a "priority claim." [1] The Debtors and the Trustee acknowledge that the full satisfaction of these claims would take the better part of the first four years of the plan, assuming the Debtors maintained currency in payment. Only after that would remaining unsecured creditors receive any distribution. The Debtors' counsel alleges that the plan would allow unsecured creditors to realize 46 percent of the amount of their claims, if all such claims are allowed as they are scheduled.[2]

The claim of State Bank and Trust Company is secured by a 1991 Bayliner 16 ft. recreational boat, a 90 horsepower motor, and an accompanying trailer. The Debtors' proposal to preserve this claim and to service it through the Chapter 13 estate has prompted the Trustee's objection. As the Trustee's counsel notes, were this secured claim deleted from the plan, the Debtors could make full payment on all of their unsecured debts in 36 months. Colloquially phrased, the issue presented is: Should the remedy of Chapter 13 discharge be available to a debtor who proposes to retain recreational equipment which many people would consider to be a luxury, and to use the Chapter 13 estate to pay for those assets in full before any other creditors receive payment? The question may be posed more legalistically: Does a Chapter 13 plan violate the "good faith" requirement of 11 U.S.C. § 1325(a)(3), or the "best

1. The Debtors' counsel's nomenclature is imprecise. In setting up the treatment of this claim, he apparently follows the lead of *In re Leser,* 939 F.2d 669 (8th Cir.1991); the thought seems to be that this claim is separately classified, with payment in full which is to be prioritized in time of distribution over other unsecured claims. Strictly speaking, it is not a "priority claim" within the meaning of 11 U.S.C. § 507; it certainly is not among the classes of claims described there.

2. On its face, the modified plan purports to provide for a 100 percent distribution on account of allowed unsecured claims. This has to be an error; unless the majority of the scheduled unsecured creditors fail to file proofs of claim, the stated payment obligation to the Trustee cannot possibly fund a full distribution.

efforts" requirement of 11 U.S.C. § 1325(b)(1), when it proposes a highest-priority treatment for a claim secured by non-essential but valuable recreational equipment, and deferred and reduced payment to unsecured creditors?

Several courts have addressed this question. *See In re Hedges*, 68 B.R. 18 (Bankr. E.D.Va.1986) (involving recreational boat); *In re Moore*, 24 B.R. 857 (Bankr.N.D.Ill. 1982) (involving Kawasaki motorcycle). Others have made the same inquiry in cases involving expensive motor vehicles, most of them purchased a short time before the debtor's Chapter 13 filing. *See In re Jenkins*, 20 B.R. 642 (E.D.Ark.1982) (involving Ford pickup truck, purchased less than one year before filing); *In re Jernigan*, 130 B.R. 879 (Bankr.N.D.Okla.1991) (involving Ford automobile termed "expensive and valuable" by court); *In re Jones*, 119 B.R. 996 (Bankr.N.D.Ind.1990) (involving 1989 Cadillac Brougham automobile); *In re Reyes*, 106 B.R. 155 (Bankr.N.D.Ill. 1989) (involving 1988 Chevrolet Blazer); *In re Rogers*, 65 B.R. 1018 (Bankr.E.D.Mich. 1986) (involving red [3] 1984 Corvette automobile); *In re Nkanang*, 44 B.R. 955 (Bankr.N.D.Ga.1984) (involving 1981 Oldsmobile Cutlass Supreme automobile); *In re Davidson*, 10 B.R. 374 (Bankr.W.D.Mich. 1981) (involving 1978 Oldsmobile Cutlass automobile); *In re Granger*, 7 B.R. 15 (Bankr.S.D.Ohio 1980) (involving 1979 Lincoln Town Sedan automobile); *In re Patterson*, 4 B.R. 239 (Bankr.C.D.Cal.1980) (involving 1978 Pontiac Trans Am automobile). *See, further, In re Lindsey*, 122 B.R. 157 (Bankr.M.D.Fla.1991) (involving 40–acre parcel of nonhomestead real estate, held as investment, which did not produce income).

Virtually every one of these courts took a variant approach to its analysis; the cases differ in the extent of their reliance on the statutory language of the Bankruptcy Code, and in the relative weight assigned to 11 U.S.C. §§ 1325(a)(3) and 1325(b)(1). Some of them rely on articulated rules of decision with specific criteria; others resort to broad invocations of "equity," or apply general, hortatory standards of conduct which they expect of a debtor seeking Chapter 13 relief. The only thing which did not vary in these cases was the conclusion: in all of them, the courts held that the debtors were not properly invoking Chapter 13 remedies when they proposed to subordinate unsecured creditors' rights to their time-purchase of specific assets which were not essential to a "fresh start." These decisions are correct in their result, but there is a rationale to reach it which is more objective and founded in statute.

Most of the recent decisions rely on 11 U.S.C. § 1325(b) [4] as the main, or exclusive, statutory basis for denying confirmation. *See In re Lindsey*, 122 B.R. at 158–159; *In re Reyes*, 106 B.R. at 157–158; *In re Hedges*, 68 B.R. at 20–21; *In re Rogers*, 65 B.R. at 1020–1021. Contrary to their belief, however, this statute is not applicable to the problem at hand.

Section 1325(b) was added to the Bankruptcy Code in the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 317, 98 Stat. 333, 356 (1984). It incorporates a "best efforts" or

**3.** Apparently, the tint of this automobile caused more than one court to see a similar hue; the presiding judge made a point of noting its color, as did the court in *In re Jones*, 119 B.R. at 1000, in citing *Rogers*.

**4.** The relevant provisions of § 1325(b) are as follows:

(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor ...

"ability to pay" test into the Chapter 13 confirmation process, which is triggered only upon the objection of the trustee or an allowed unsecured creditor. *In re Jones,* 55 B.R. 462, 465 (Bankr.D.Minn.1985). Upon such an objection, the debtor must either demonstrate that the plan provides for full payment of allowed unsecured claims, § 1325(b)(1)(A), or prove that he is committing all of his "disposable income" to the making of payments to creditors under his plan, § 1325(b)(1)(B). *In re Le-Maire,* 883 F.2d 1373, 1379 (8th Cir.1989) (panel decision), *vacated,* 891 F.2d 650 (8th Cir.1990), *on rehearing,* 898 F.2d 1346 (8th Cir.1990) *(en banc)*; *In re McDaniel,* 126 B.R. 782, 784 (Bankr.D.Minn.1991); *In re Jones,* 55 B.R. at 465. The phrase "disposable income" is statutorily defined; in a consumer Chapter 13 case, it means all income which is not committed to the reasonable, necessary living expenses of the debtor and his dependents. *See* 11 U.S.C. § 1325(b)(2); *In re McDaniel,* 126 B.R. at 784; *In re Jones,* 55 B.R. at 465.

■ Those courts which have cited § 1325(b) to deny confirmation of plans which proposed to have substantial debts secured by expensive automobiles or other personalty serviced under the auspices of the plans, have done so on their conclusion that the encumbered assets were not essential to the basic support needs of the debtors and their dependents. *See In re Lindsey,* 122 B.R. at 158; *In re Reyes,* 106 B.R. at 157–158; *In re Hedges,* 68 B.R. at 21; *In re Rogers,* 65 B.R. at 1021. These courts, however, overlook the basic accounting format that §§ 1325(b)(1)(B) and 1325(b)(2)(A) establish: in calculating "disposable income," the court is to reduce the debtor's received after-tax income by the amount of the debtor's statutorily-qualified living expenses. *In re Jones,* 119 B.R. at 1000; *In re Jones,* 55 B.R. at 465. Once it isolates that value, the court is to compare it to the sum which the debtor proposes to commit to payments to creditors under his plan. *In re Jones,* 55 B.R. at 467. If the plan

incorporates secured debt payments into its general treatment of creditors' claims, those payments necessarily are "under the plan," whether the trustee is to pay them or not. *In re Jones,* 119 B.R. at 1000–1001. Such payments, then, are not to be considered as line-entries for the household budget used in the calculation of "disposable income"; this would retroject them into the wrong stage in the calculation under the statutory test. As a result, the reasonableness-and-necessity criteria of § 1325(b)(2) should not be applied to them. *In re Jones,* 119 B.R. at 1001. *See also In re Lindsey,* 122 B.R. at 158 (debt-service payments on large nonexempt assets build up equity in debtors' favor, and amount to investments; such investments are made *with* disposable income, not with the gross income from which one calculates disposable income under the statute). The import, of course, is that § 1325(b)(1)(B) does not afford a basis for objecting to proposals such as the one at bar.[5]

■ 11 U.S.C. § 1325(a)(3) does, however. As a condition of confirmation, it requires the proponent of a Chapter 13 plan to demonstrate that "the plan has been proposed in good faith ..." In applying this provision, the Bankruptcy Court must make:

> ... a separate, independent determination.... [T]he proper inquiry should [analyze] whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13. The Bankruptcy Court must utilize its fact-finding expertise and judge each case on its own facts after considering all the circumstances of the case.

*In re Estus,* 695 F.2d 311, 316 (8th Cir. 1982). *See also In re LeMaire,* 898 F.2d at 1349 *(en banc)* (reaffirming applicability of *Estus*'s totality-of-circumstances analysis); *Noreen v. Slattengren,* 974 F.2d 75, 76 (8th Cir.1992).

Before the enactment of 11 U.S.C. § 1325(b), the Eighth Circuit suggested

---

5. The Trustee has not objected to the amount, reasonableness, or necessity of any line-entry for particular living expenses in the Debtors' budget. Thus, the usual inquiry under

§ 1325(b)(1)—*see In re Jones,* 55 B.R. at 466–467 and *In re McDaniel,* 126 B.R. at 784—is not required.

that some eleven non-exclusive factors would be relevant to a determination on good faith under § 1325(a)(3). *In re Estus,* 695 F.2d at 317. In the wake of that enactment, it concluded that most of the financially-related factors under *Estus* had been "subsume[d]" by § 1325(b). The court is now to

> ... look at factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code.

*Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987). It must also consider the type of debt which the debtor seeks to discharge in Chapter 13; whether any of that debt would be nondischargeable in a Chapter 7 case; and "the debtor's motivation and sincerity in seeking Chapter 13 relief." *In re LeMaire,* 898 F.2d at 1349. The court is not to determine and consider these factors mechanically, or in light of any precise formula; it is, however, to "consider the totality of the circumstances in light of the purposes of Chapter 13," and the general policies underlying bankruptcy relief. *In re LeMaire,* 898 F.2d at 1353. *See also Noreen v. Slattengren,* 974 F.2d at 76.

▮ Under *Zellner* and *LeMaire,* the good faith requirement focuses on the debtor's motivation for seeking Chapter 13 relief; the financial and personal goals he seeks to accomplish through his case; and his attitude toward the integrity of the bankruptcy process, as manifested on the face of his statements, schedules, pleadings, and plan. An objecting party need not prove that the debtor is committing actual fraud in the common-law sense. *In re Fischer,* 136 B.R. 819, 830 (D.Alaska

1992). Nor need it prove that the debtor harbors actual malice toward a creditor, or toward creditors generally. *In re Waldron,* 785 F.2d 936, 941 (11th Cir.1986).[6] A determination of bad faith may be made solely on the basis of objective documentary or transactional evidence, and even just on a plan's facial provisions for treatment of creditors' claims. *See, e.g. In re Belden,* 144 B.R. 1010 (Bankr.D.Minn.1992) (noting that debtor had filed for relief under Chapters 7 or 13 nine times in 14 years, in the face of shutoff notices from her electric utility in the last four instances; concluding on basis of pattern in filings alone that debtor's "clear" motivation in filing most recent petition was to avoid utility's disconnection of service to her; and holding that debtor lacked good faith under § 1325(a)(3)). As one court has noted,

> ... the "good faith" requirement has long been the policing mechanism of bankruptcy courts to assure that those who invoke the reorganization provisions of the bankruptcy law do so only to accomplish the aims and objective of bankruptcy philosophy and policy and for not other purpose.

*In re Chase,* 43 B.R. 739, 745 (D.Md.1984).

The factors noted in *Zellner* and *LeMaire* all go to the basic policies underlying bankruptcy relief, and the public policy supporting its fair and even-handed administration. The first two *Zellner* factors go to whether the debtor is dealing fairly and openly with the court and creditors. The maxim may be cliched by now, but it still has vitality in binding caselaw precedent: bankruptcy is for the "honest but unfortunate debtor." *E.g., Brown v. Felsen,* 442 U.S. 127, 128, 99 S.Ct. 2205, 2208, 60 L.Ed.2d 767 (1979); *Lines v. Frederick,* 400 U.S. 18, 19, 91 S.Ct. 113, 113, 27 L.Ed.2d 124 (1970); *Local Loan Co. v. Hunt,* 292

---

**6.** One might quibble that this should not be assumed to be the rule in the Eighth Circuit; the debtor's pre-petition conduct toward the objecting creditors in both *LeMaire* and *Noreen* was egregious and intentional, and both opinions put overwhelming emphasis on that fact in reaching the conclusion that the debtors lacked good faith. This reading, however, flies in the face of the Eighth Circuit's general concession that

a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors.

*In re LeMaire,* 898 F.2d at 1352 (quoting *Neufeld v. Freeman,* 794 F.2d 149, 153 (4th Cir.1986)).

U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934); *In re LeMaire*, 898 F.2d at 1352; *In re Ophaug*, 827 F.2d 340, 343 (8th Cir.1987); *Bostwick v. United States*, 521 F.2d 741, 746 n. 12 (8th Cir.1975). On the record here, one cannot conclude that the Debtors do not measure up to this broad observation; they have not concealed or misrepresented any aspect of their debt or asset structures, and they have been straightforward with the Trustee and the Court about what they hope to accomplish through this case. There is no basis for a finding of bad faith under these factors.

■ This, however, is not the full measure of the Debtors' proposal against § 1325(a)(3). The third *Zellner* factor— whether the debtor "has unfairly manipulated the Bankruptcy Code"—is the most open-ended of all the *Zellner/LeMaire* factors. It is, however, the one most centrally implicated in this case. Its application to the facts at bar requires one to recognize the "big picture" in bankruptcy. An equitable balance between the rights of debtors and the rights of creditors underlies the structure of the Bankruptcy Code. *In re Schuster*, 132 B.R. 604, 611 (Bankr.D.Minn. 1991). In fashioning relief, the Bankruptcy Court must maintain this balance to the greatest extent possible. *Id.* In an individual consumer's bankruptcy case, the balance lies between the debtor's right to commence a post-discharge fresh start with a modicum of designated assets, and the creditors' right to obtain some satisfaction from the bankruptcy estate on account of their pre-petition claims. *Id.*

In a Chapter 7 case, of course, the debtor's right to retain assets is fixed by the exemption rights afforded by 11 U.S.C. § 522(b); creditors' expectations of recovery from the estate are usually dashed by the relative generosity of American exemption laws, as applied to the economic fact of debtors' limited property holdings. In most Chapter 7 cases, there is little meaningful balancing between debtors' and creditors' interests in a financial or economic sense; the debtor's obligation ends up running more to the legal process itself, and is embodied in various statutory requirements of disclosure and cooperation with the trustee. *See, e.g. In re Mathern*, 137 B.R. 311 (Bankr.D.Minn.1992), *aff'd*, 141 B.R. 667 (D.Minn.1992); *In re Losinski*, 80 B.R. 464 (Bankr.D.Minn.1987); *In re Drenckhahn*, 77 B.R. 697 (Bankr.D.Minn. 1987).

In a Chapter 13 case, the balancing is more involved, both in the ascertainment of each side's financial rights and in the process of equalizing them in light of statutory standards. It is, however, much more likely to result in a real financial return to creditors. The debtor has the right to retain the exempt and the nonexempt property which he held as of the commencement of the case, without surrendering control of any of it as he would in a Chapter 7 case. H.R.REP. No. 595, 95th Cong. 1st Sess. 118 (1977), 1978 U.S.Code Cong. & Ad.News 5787, 6079. This comes, of course, at a cost, which is dictated and structured by creditors' recognized right to receive a meaningful, fair return on their claims. The "best-interests-of-creditors" test of 11 U.S.C. § 1325(a)(4)[7] and the best-efforts test of § 1325(b)(1) set a floor for creditors' expectations, but by no means do they set a ceiling. The consideration for the Chapter 13 debtor's broader right to retain assets and broader discharge is more than the statutory minima; it includes

> ... an expectation that the debtor will use his or her best efforts to accomplish repayment to creditors *in the maximum amount possible* while still providing support for ... self and ... family.

*In re Weyand*, 33 B.R. 553, 557 (Bankr. D.Colo.1983) (emphasis added).

---

7. This statute requires the debtor to demonstrate that

the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date.

As to unsecured creditors, it requires the debtor to commit an amount of money to payment on their claims that is at least equal to the value of his nonexempt assets.

█ Cases where a Chapter 13 debtor holds and proposes to keep valuable, nonexempt, encumbered property require an assessment of the equitable balance, and an adjustment if the plan does not provide or maintain it. The reason, of course, is that the application of post-petition income to reduce the secured claim which encumbers the property necessarily takes value away from other creditors. The fact that a plan may technically meet the minima of §§ 1325(a)(4) and 1325(b)(1) is not the final consideration. Section 1325(a)(4) requires the court to factor the value of all of a debtor's property into its analysis of confirmability anyway. 11 U.S.C. § 1306(a)(2) similarly makes all of a debtor's post-petition income property of the estate. This places such income under the jurisdiction of the court, and makes its availability subject to consideration in the confirmation determination. Since all of this economic value is relevant to the case, then, it all can come under scrutiny under the rubric of the good faith determination.

█ In situations like the one at bar, the competing rights of debtor and creditors are most appropriately recognized and balanced as follows: the debtor may retain *unencumbered* pre-petition value in nonexempt property by proposing to pay at least its equivalent to holders of unsecured claims, pursuant to § 1325(a)(4). Beyond that, however, claimants against the estate—*including unsecured creditors*— have an additional call on the debtor's post-petition income. To the extent that such income is directed to reasonable family living expenses, § 1325(b)(1)(B) shelters it. A plan may shelter additional income by directing it to satisfy secured claims against exempt property, such as homestead real estate or moderately-priced motor vehicles used for trade, family, or household purposes. This use of the property of the

Chapter 13 estate permissibly furthers the debtor's post-bankruptcy fresh start, by allowing the buildup of modest equity in those assets which the legislative branch has deemed necessary to maintain one's household, livelihood, and retirement security. However, creditors have full cause to complain if a debtor proposes to service a secured debt against expensive nonexempt assets, particularly where the claim is to receive high priority in payment under the plan. In such a case, the debtor proposes to build up equity in assets which the legislature has not found essential to a fresh start; more crucially, the debtor proposes to correspondingly defer, reduce, or even deny a return to other creditors on their prior claims, by diverting estate resources to nonessential purposes. This impermissibly tips the balance of bankruptcy relief far over to the debtor's side. Such a plan grants a windfall to the debtor, enriching him at creditors' expense to the extent of the equity accumulated post-petition. It does not meet the requirement of § 1325(a)(3). *See In re Fischer*, 136 B.R. at 830.

For this reason alone, the plan at bar cannot be confirmed. Notwithstanding the Debtors' lack of malice, guile or avarice, one cannot conclude that their plan conforms with the spirit of Chapter 13, or meets the statutory goal of a meaningful return to holders of bona fide pre-petition claims.

█ Beyond this, another aspect of the Debtors' debt structure and plan implicates an additional factor under *LeMaire*. A significant component (some 52 percent) of the Debtors' scheduled unsecured debts is educational loans. Congress has severely limited debtors' ability to obtain discharge of such obligations. Since the enactment of the 1978 Code, 11 U.S.C. § 523(a)(8)[8] has

8. The language of this statute is:
A discharge under [11 U.S.C. §§] 727, 1141, 1228(a), 1228(b), or 1328(b) ... does not discharge an individual debtor from any debt—

. . . . .

for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental

unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the

excepted them from discharge under any chapter of the Bankruptcy Code other than Chapter 13, absent a showing of the exceptional circumstances specified in the statute. Since November, 1990, such obligations have been excepted in the same fashion from the more general discharge of Chapter 13. *See* 11 U.S.C. § 1328(a)(2).[9]

The Debtors do not intend to commence proceedings to have their educational-loan debts found dischargeable. They acknowledge that the debts will survive Chapter 13 discharge. They do not propose any separate classification or treatment of them, intending to give them the same 46 percent distribution from the estate that any other unsecured claim would receive. The statutory exception, the Debtors say, affords enough protection to the affected lenders, and renders the existence of these claims irrelevant to a determination on good faith.

The problem is that the plan would defer *any* payment to holders of these claims for approximately three years, while the Debtors build up equity in the boat, motor, and trailer. A significant share of these debts will remain unpaid, long after they were incurred. The Debtors acknowledge that they will have to come to terms with their educational lenders once they are out of Chapter 13, but do not evince how they will do so.

To be sure, Congress already has given such claims significant status under the Bankruptcy Code, to reflect the special nature of their genesis and the permanent personal and vocational benefit they confer on recipients of the underlying loans. Nondischargeability is a significant legislative enhancement of such creditors' rights in Chapter 13 cases. However, this does not mean that they are not entitled to additional consideration under the rubric of § 1325(a)(3). *LeMaire* requires the court to consider the circumstance of nondischargeability as a magnifier of an objector's right to demand utter good faith from a Chapter 13 debtor. Given the significance that *LeMaire* attaches to nondischargeability, it would be unconscionable to allow the Debtors to completely evade any obligation of current, regular payment to these lenders for the three-year period while they prepare to take the boat, motor, and trailer free and clear.[10]

To some, this conclusion may seem harsh.[11] There is no reason to doubt the Debtors' statement that the boat furnishes them good, clean recreation together, and may strengthen their family ties by fostering future fond memories. In the last instance, however, such considerations are irrelevant. The inquiry has to be to the bottom line of creditors' realization, against debtors' reasonable needs. If the Debtors really want debt relief under Chapter 13, it must be structured in a fashion to give more deference and greater value to their unsecured creditors' claims than they have proposed.

---

date of the filing of the [bankruptcy] petition; or
 (B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents ...

**9.** In pertinent part, this statute provides:
(a) As soon as practicable after completion by the debtor of all payments under the plan, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under [Chapter 13], the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under [11 U.S.C. §] 502 ..., except any debt—

 . . . . .

 (2) of the kind specified in paragraph ... 8 of [11 U.S.C. §] 523(a) ...
This provision was added to the Code by the Omnibus Budget Reconciliation Act of 1990,

Pub.L. No. 101–508, § 3007(b)(1), 104 Stat. 1388, 1388–28 (1990). The Act was signed by the President on November 5, 1990.

**10.** This ruling is limited to the facts at bar, under which the Debtors are subordinating the payment rights of a statutorily-preferred creditor to their own time-purchase of a luxury good. It does not suggest that an objection to confirmation may be based on the mere inclusion of a nondischargeable educational loan in a class of unsecured debts under a Chapter 13 plan, without more.

**11.** The suggestion that a boat, motor, and trailer are not necessities of life probably smacks of heresy to avid sportspersons and to many citizens of the Land of 10,000 Lakes. To date, however, this mindset has lacked enough adherents in the Minnesota Legislature.

IT IS THEREFORE ORDERED that confirmation of the Debtors' modified plan of debt adjustment, as filed on July 6, 1992, is denied.